**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

ALLSTATE INSURANCE COMPANY,
Plaintiff,

v.

JOHN BONN and NATALIE BONN
Defendants,

C.A. No. 09-171ML

v.

ANTONIA and DAVID JESSUP,
Intervenors.

**MEMORANDUM AND ORDER**

In this insurance coverage case, Allstate Insurance Company ("Allstate") filed a complaint for declaratory action against John[1] and Natalie Bonn (the "Bonns"), the insured under a Landlords Package Policy, (the "Policy") issued by Allstate. The Bonns' former tenants, Antonia and David Jessup (the "Jessups") have intervened in this action individually and as parents, natural guardians and next-of-friends of their two minor children, D. and B.

The matter is before the Court on cross-motions for summary judgment by Allstate and the Jessups. Previously, the Jessups filed a complaint in Rhode Island state court against the Bonns,

1 John Bonn died shortly before Allstate filed a declaratory action against the Bonns in this Court.

alleging that D. and B. were exposed to lead paint and suffered lead poisoning during the Jessups' tenancy at property owned by the Bonns. Allstate now seeks a declaration that its liability for claims asserted by the Jessups against the Bonns in the underlying complaint is limited to a total amount of $100,000. The Jessups seek to establish that coverage under the Policy extends to $100,000 for each of their two minor children, for a total sum of $200,000.

For the reasons hereinafter stated, Allstate's motion for summary judgment is GRANTED and the Jessups' motion for summary judgment is DENIED.

## I. Factual Background

The facts in this case are essentially undisputed. In July of 1997, the Jessups rented a single family residence (the "Subject Property") owned by the Bonns in Warwick, Rhode Island. During the same month, the Jessups moved into the Subject Property with their 15 month old twins D. and B. On July 2, 1997, Allstate issued the Policy to the Bonns, which was in effect from June 16, 1997 to June 16, 1998.

The Policy declarations page provides business liability protection coverage pursuant to Coverage X in the amount of $100,000 for "each occurrence." Occurrence is not further defined in the Policy. Under Coverage X, Allstate is obligated to "pay all sums which an insured person becomes legally liable to pay as

damages arising from the same loss . . ." that arises from ownership of the insured premises. The Policy's "Limits of Liability" provision states, in relevant part, as follows:

> This insurance applies separately to each insured person. Regardless of the number of insured persons, injured persons, claims, claimants or policies involved, our total liability under Business Liability Protection coverage for damages resulting from one loss will not exceed the limit of liability for Coverage X shown on the declarations page. <u>All bodily injury, personal injury and property damage resulting from one accident or from continuous or repeated exposure to the same general conditions is considered the result of one loss.</u>
>
> Policy, document page 22, ¶ 4 (Emphasis added).

On June 22, 1998, a blood test performed on D. revealed a blood lead level (BLL) of 55 µg/dL[2]. Following this discovery, the Rhode Island Department of Health ("RIDH") inspected the Subject Property on June 30, 1998 for the presence of lead. The inspection revealed lead paint in hazardous and deteriorating conditions throughout the Subject Property. On July 8, 1998, a blood test performed on B. revealed a BLL of 48 µg/dL. On August 4, 1998,

---

2 Blood lead level is measured in micrograms of lead per deciliter of blood (µ/dL). The Rhode Island Lead Poisoning Prevention Act, R.I. Gen. Laws §§ 23-24.6 et seq., defines "Environment intervention blood level" as "a confirmed concentration, in a person under six (6) years of age, of lead in whole blood of greater than or equal to twenty (20) micrograms per deciliter for a single test or for fifteen (15) to nineteen (19) micrograms per deciliter for two (2) tests taken at least three (3) months apart or as defined by the department consistent with regulations adopted by the U.S. Department of Housing and Urban Development." R.I. Gen. Laws § 23-24.6.-4(7).

RIDH issued a Notice of Violation to Natalie Bonn after determining that the Subject Property revealed "lead hazards which are in violation of the Lead Poisoning Prevention Act (RIGL 23-24.6), the Rules and Regulations for Lead Poisoning Prevention (R23-24.6-PB) and the Housing Maintenance and Occupancy Code (RIGL 43-24.3)." Notice of Violation at 1.

Subsequent testing of D.'s BLL revealed levels of lead that slowly declined over time, varying from 35 µ/dL on June 24, 1998 to 4 µ/dL on October 29, 2002. B., who was apparently more frequently tested, generally presented with higher BLLs, varying from 30 µ/dL on August 5, 1998 to 9 µ/dL on October 29, 2002. Functional assessments performed in December 2004 concluded that, at the age of eight and a half, both girls continue to suffer from the effects of early lead exposure.

On March 19, 2001, the Jessups filed suit against the Bonns in Rhode Island state court, individually and on behalf of their minor children. The complaint asserts claims of negligence and negligent misrepresentation and omissions, alleging that, throughout the Jessups' tenancy at the Subject Property, "there existed dangerous, hazardous, and illegal levels of lead-based paint, plaster and materials inside the dwelling and generally within and about the dwelling." State court complaint at ¶ 4. The Jessups claimed that the identified lead hazards at the Subject Property "were not corrected in a timely fashion and continued to pose a health

threat," id. at ¶ 6, and that the Bonns misrepresented the Subject Property as "safe, habitable and free from lead paint." Id. at ¶ 19.

On April 9, 2009, Allstate filed a complaint for declaratory judgment against the Bonns in federal district court. On August 3, 2009, the Jessups filed a motion to intervene, which was granted absent opposition. The Jessups filed a motion for summary judgment on March 1, 2010. On March 9, 2010, Natalie Bonn filed a response, stating that she took no position to the Jessups' motion. On March 18, 2010, Allstate filed an objection to the Jessups' motion, together with a cross-motion for summary judgment. The Jessups have filed no further objection to Allstate's motion.

**II. Standard of Review**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the relevant evidence is such that "a rational factfinder [could] resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A "material" fact is one that "has the capacity to sway the outcome of the litigation under the applicable law." Id.

The moving party bears the burden of demonstrating that no genuine issue as to any material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such requisite showing has been made, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

The standard set by Rule 56 is not altered when parties file cross-motions for summary judgment; it merely requires the Court to determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). For that determination, all facts are reviewed "in the light most favorable to the respective non-moving parties." Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005).

Because jurisdiction in this case is based on diversity, a decision regarding the parties' rights under the Policy, which was apparently entered and intended to be performed in Rhode Island, is based on Rhode Island law.[3] See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

---

[3] Although the parties do not explicitly address this issue in their memoranda, both cite to Rhode Island case law in support of their respective positions.

Whether, and the extent to which, a plaintiff is covered by an insurance policy is a determination which "requires judicial construction of the policy language as a matter of law.'" Medeiros v. Anthem Cas. Ins. Group, 796 A.2d 1078, 1080 (R.I. 2002). Under Rhode Island law, it is well established that "when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end [and] [t]he contract terms must be applied as written." Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 551 (R.I. 1990). Therefore, prior to construing the terms of a policy, the Court must first determine whether an ambiguity exists. Id. at 551-552. For such a determination, the Court views the Policy in its entirety and gives the "language employed . . . its 'plain, ordinary and usual meaning.'" Id. at 552 (citation omitted). The applicable test "is not what the insurer intended, but what the ordinary reader and purchaser would understand them to mean." Zarella v. Minnesota Mut. Life Ins. Co., 824 A.2d 1249, 1259 (R.I. 2003). The Court "will not depart from the literal language of the policy absent a finding that the language of the policy is ambiguous." Medeiros v. Anthem Cas. Ins. Group, 796 A.2d at 1080.

## III. Discussion

### A. Policy Language

The Jessups assert that the Policy provides $100,000 in coverage for each of their two children to help compensate them for losses suffered as a result of lead poisoning. Jessups' Mem. 1.

Specifically, the Jessups suggest that (1) their children's lead poisoning was the result of multiple occurrences; (2) the Policy language is ambiguous and should be construed in favor of the insured; (3) the "cause theory" mandates a finding of multiple occurrences; (4) precedent exists for awarding each child injured by a single occurrence the full policy limit; and (5) restricting the children's remedy to a single policy limit is against public policy. Id. at 5-15.

In response, Allstate submits that the Policy unambiguously limits its obligations under Coverage X to $100,000, "regardless of the number of injured persons, claims or claimants." Allstate Mem. 2. Allstate maintains that the injuries suffered by the Jessups' children are "the result of one loss" because they ensued from "continuous or repeated exposure to the same general conditions" and that, under those circumstances, coverage under the Policy is limited to a total amount of $100,000 for all claims asserted by the Jessups. Id. at 3.

The language of the Policy in this case is clear. It provides that total liability for Coverage X is limited to $100,000, "[r]egardless of the number of . . . injured persons [or] claims." The "plain and ordinary meaning" of that provision is that, regardless of whether damages resulting from one loss involve a single injured person or many, Allstate is obligated to pay no more than $100,000 total under the Policy.

Further, the Policy defines "one loss" as "[a]ll bodily injury, personal injury and property damage resulting from one accident or from continuous or repeated exposure to the same general conditions." (Emphasis added). The Policy terms "all bodily injury [and] personal injury" clearly encompass the lead poisoning suffered by both D. and B. as a result of continuous or repeated exposure to the same existing and continuing conditions at the Subject Property, i.e. the presence of lead in the residence. The injury, although tragically suffered by both minor children, constitutes only "one loss" under the unambiguous language of the Policy.

The Court's determination is not inconsistent with the First Circuit's decision in United States Liab. Ins. Co. v. Selman, 70 F.3d 684 (1st Cir. 1995), on which the Jessups rely in asserting that "spikes in blood level in the same child can be viewed as new injuries and new occurrences," Jessups' Mem. at 5 n. 3. In Selman, the tenant's minor child contracted lead poisoning between May of 1983 and September 1986 while living at the insured's premises. The tenancy spanned several policy periods under two different insurers. United States Liability Insurance Company ("USLI"), which had issued a policy after the minor child had already been diagnosed with lead poisoning, argued, inter alia, that the child's injuries were the result of earlier ingestion of lead, which fell outside of the USLI policy period.

The district court found that subsequent blood level tests of the minor child, evidencing occasional sharp increases in lead, were the result of "sporadic ingestion of paint chips" and that those incidents caused "new and further injuries," which triggered the coverage under the USLI policy. Id. at 688-89. The Court of Appeals affirmed, noting that, once coverage was triggered, the insurance company bore the burden to demonstrate that coverage was precluded by contractual exclusion or other policy defenses. Id. at 689.

In the case now before the Court, the underlying complaint alleges that the Jessups' children were injured through exposure to the presence of lead at the Subject Property "throughout the tenancy at defendants' premises," where it "continued to pose a health hazard" to the children. Underlying Complaint at ¶¶ 5, 6. While the varying results of D.'s and B.'s blood level tests appear to indicate that each child ingested different amounts of lead at different times, it is undisputed that they were both equally exposed to the same health hazard at the same residence during the Policy period. It is likewise undisputed that the Jessups' assertions that continuing exposure to lead resulted in injuring both children are sufficient to trigger the Policy. However, the limitation of the Coverage X liability provision clearly precludes a separate recovery by each child for the full amount of the Policy. Based on the unambiguous language of the Policy, the

amount payable for an allowable claim under Coverage X is limited to a total amount of $100,000.

B. Cause Theory

A consideration of the "cause theory" advanced by the Jessups does not yield a different result in this case. The Jessups propose that "[t]his case, and lead poisoning cases in general, exemplifies a multiple occurrence scenario." Jessups' Mem. 11.

No Rhode Island Court has yet addressed the question of whether exposure to a continuing presence of lead in a residence constitutes multiple occurrences.[4] In the context of intermittently caused property damage resulting from a defectively designed and constructed automatic carwash unit, then Chief Judge Pettine of this Court determined that the damage was the result of one occurrence. Bartholomew v. Ins. Co. of North America, 502 F. Supp. 246 (D.R.I. 1980)("Bartholomew I"), affirmed by Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir. 1981). Bartholomew I noted that "[t]o determine whether more than one occurrence took

4

It is established Rhode Island law that "the dissemination of contaminants, through seepage, for an undetermined number of years constitutes a continuous or repeated exposure to conditions resulting in property damage; however, such continuous activity constitutes only one occurrence for purposes of an insurance policy." Ins. Co. of North America v. Kayser Roth Corp., 1999 WL 813661 *28 (R.I. Super. Jul. 29, 1999) (citing Truk-Away of Rhode Island, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309, 313 (R.I. 1999)).

place, the majority of jurisdictions employs the 'cause theory.'"[5] Bartholomew I at 251. The "cause theory" questions whether "(t)here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." Id. "If so, there has been but one occurrence, even though several discrete items of damage resulted." Id. (listing cases). Chief Judge Pettine also expressed the belief that Rhode Island would follow the majority view.

Citing to Bartholomew I, the Rhode Island Superior Court applied the "cause theory" in an insurance dispute involving allegations of civil rights violations. Town of Cumberland v. Rhode Island Interlock Risk Mgmt Trust, Inc., 2001 WL 1097785 at *6 (R.I. Super. Sept. 17, 2001). The state court concluded that "a single occurrence exists even if there are several discrete elements of damages and several injured parties." Id.

In the case now before this Court, the allegations of the underlying complaint all point to the same uninterrupted cause for the injuries suffered by D. and B.: the continuing, unabated presence of lead in the residence throughout the Jessups' tenancy. Although the children may have ingested the lead at different times

---

5 A minority of jurisdictions employs the "effect theory," which "determines the number of accidents or occurrences by looking at the effect an event had, i.e. how many individual claims or injuries resulted from it." Nicor, Inc. v. Associated Elec. and Gas Ins. Serv., Ltd., 860 N.E.2d 280, 287 (Ill. 2006).

and their blood tests showed different levels of exposure, the injuries all flowed from the same conditions in their immediate environment. Even without a more specific definition for the term "occurrence" in the Policy, the unambiguous language of Section 4 clearly precludes any recovery in excess of the $100,000 Policy limit.

Because this Court determines that the language of the Policy is unambiguous and that the injuries suffered by the Jessups' children are the result of a single occurrence, it need not consider the remaining arguments raised by the Jessups.

**Conclusion**

For the reasons stated in this Memorandum and Order, Allstate's motion for summary judgment is GRANTED and the Jessups' motion for summary judgment is DENIED.

SO ORDERED.

Mary M. Lisi

Mary M. Lisi
Chief United States District Judge
May 3, 2010